IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JESSICA STARK, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:21-cv-03822 |
| | § | |
| ABC PEDIATRIC CLINIC, P.A., et al. | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM OF LAW**

Respectfully submitted,

/s/ *Charles H. Wilson*
Charles H. Wilson (Attorney-in-Charge)
Federal I.D. No. 34581
Texas Bar No. 797678
Charles.Wilson@jacksonlewis.com
Haley E. Kurisky
Federal I.D. No. 3709694
Texas Bar No. 24125798
Haley.Kurisky@jacksonlewis.com

**JACKSON LEWIS P.C.**
717 Texas Avenue. Suite 1700
Houston, TX 77002
Telephone:      (713) 650-0404
Facsimile:      (713) 650-0405

**ATTORNEYS FOR DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

TABLE OF AUTHORITIES ................................................................................................. iv

I.  NATURE AND STAGE OF PROCEEDING...................................................................1

II.  SUMMARY OF THE ARGUMENTS ............................................................................2

III.  STATEMENT OF RELEVANT UNDISPUTED FACTS...............................................3

  A.  Introduction....................................................................................................3

  B.  Stark's Employment with ABC ......................................................................3

  C.  Stark Decides to Attend Law School ..............................................................5

  D.  Plaintiff Temporarily Resides with the Individual Defendants.......................6

  E.  Plaintiff's Termination ...................................................................................7

  F.  Stark Sabotages and Interferes with ABC's Work..........................................9

IV.  SUMMARY JUDGMENT STANDARD OF REVIEW .................................................9

V.  ARGUMENTS AND AUTHORITIES..........................................................................10

  A.  Plaintiff's TMFPA Retaliation Claim ..........................................................10

    1.  Stark did not engage in protected activity known to ABC...................11

    2.  Stark's termination was for legitimate, nondiscriminatory
       reasons and was not the "but for" result of her protected activity .....14

    3.  No other adverse employment action occurred in connection with
       Stark's alleged "complaint." ...............................................................15

  B.  Plaintiff's FLSA claims................................................................................16

    1.  Stark's overtime claim........................................................................16

      a.  Stark's overtime claim is barred by the two-year
         statute of limitations ..............................................................16

**b.**   **As an exempt employee, Stark was not eligible for overtime payments, nor did she ever work more than forty hours such that overtime hours were earned** ................................................17

**2.**   **Stark's inaccurate recordkeeping claim fails because Section 211(c) does not create a private right of action** .....................................19

**C.**   **Plaintiff's breach of contract claims** .................................................20

**1.**   **Breach of Employment Contract Claim based on alleged unpaid PTO** ..............................................................20

**2.**   **Plaintiff's Breach of Contract Claim for Babysitting** ..........................21

**a.**   **No meeting of the minds occurred such that a valid contract for babysitting services was formed** .............................................21

**b.**   **Even if a valid contract for babysitting was formed, the oral contract involved services lasting more than one year and violates the statute of frauds** .........................................................23

**VI.**   **CONCLUSION AND PRAYER** .........................................................................24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................15

*Aviles v. Kunkle*,
   765 F.Supp. 358 (S.D. Tex. 1991), *vacated on other grounds,* 978 F.2d 201
   (5th Cir. 1992).........................................................................................24

*United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*,
   816 F.3d 315 (5th Cir. 2016) ......................................................................16

*Bush v. Kadirnet, LLC*,
   No. 1:18-CV-1024-RP, 2020 U.S. Dist. LEXIS 27820 (W.D. Tex. 2020) ............26

*Cheatham v. Allstate Ins. Co.*,
   465 F.3d 578 (5th Cir. 2006) ......................................................................23

*Dacar v. Saybolt, L.P.*,
   914 F.3d 917 (5th Cir. 2018), *as amended on denial of reh'g and reh'g en
   banc* (Feb. 1, 2019) ..................................................................................21

*Diaz v. Kaplan Higher Educ.*,
   820 F.3d 172 (5th Cir. 2016) ......................................................................16

*Fontenot v. Upjohn Co.*,
   780 F.2d 1190 (5th Cir. 1986) ....................................................................15

*Garcia v. Prof'l Contract Services, Inc.*,
   938 F.3d 236 (5th Cir. 2019) ......................................................................16

*Grimes v. Tex. Dep't of Mental Health & Mental Retardation*,
   102 F.3d 137 (5th Cir. 1996) ......................................................................15

*Hobbs v. EVO Inc.*,
   394 F. Supp. 3d 717 (S.D. Tex. 2019) ..........................................................23

*U.S. ex rel King v. Solvay Pharms.*,
   871 F.3d 318 (5th Circ. 2017).....................................................................16

*Lister v. Nat'l Oilwell Varco, L.P.*,
   No. H-11-0108, 2013 U.S. Dist. LEXIS 142254 (S.D. Tex. 2013).......................19

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988)..................................21

iv

*Mullins v. TestAmerica, Inc.*,
    564 F.3d 386 (5th Cir. 2009) ........................................................................25

*Ramos v. Al-Bataineh*,
    599 F. App'x 548 (5th Cir. 2015) .................................................................21

*Robertson v. Bell Helicopter Textron*,
    32 F.3d 948 (5th Cir. 1994) ..........................................................................17

*Scott v. Univ. of Miss.*,
    148 F.3d 493 (5th Cir. 1998) ........................................................................15

*United States ex rel. Smith v. Yale Univ.*,
    415 F. Supp. 2d 58 (D. Conn. 2006) .......................................................17, 18

*Steele v. Leasing Enters., Ltd.*,
    826 F.3d 237 (5th Cir. 2016) ........................................................................21

*Stewart & Stevenson, LLC v. Galveston Party Boats, Inc.*,
    Nos. 01-09-00030-CV, 01-09-00111-CV, 2009 Tex. App. LEXIS 8582 (Tex.
    App.—Houston [1st Dist.] Nov. 5, 2009, no pet.) ..................................26, 27

*Tavakkoli v. Helwig*,
    No. 3:16-CV-2202-N, 2017 WL 10126204 (N.D. Tex. June 20, 2017) ................25

*Vaughn v. Harris Cty. Hosp. Dist.*,
    No. 4:17-CV-2749, 2021 U.S. Dist. LEXIS 188576 (S.D. Tex. 2021) .....................17

**Statutes**

29 U.S.C.S. Sec. 207(a)(1) .............................................................................22

18 U.S.C. §1030(a)(4) and (5) .........................................................................6

28 U.S.C. §1331 ...............................................................................................6

COMM. CODE ANN. Sec. 26.01(a), (b)(6) ........................................................28

Computer Fraud and Abuse Act .....................................................................6

Fair Labor Standards Act ..........................................................................6, 21

False Claims Act ......................................................................................16, 17

FCA .........................................................................................................17, 18

FLSA (4) ...........................................................................................................6

FLSA: 29 U.S.C. Sec. 211(c) ..........................................................................24

v

FMLA ..................................................................................................................23

Loyola Law ........................................................................................................20

Tex. Hum. Res. Code § 36.115 ..................................................................15, 16

Texas Harmful Access By Computer Act..............................................................6

Texas Medicare Fraud Prevention Act (2).............................................................6

**Other Authorities**

29 C.F.R. pt. 516 ................................................................................................24

29 CFR §. 541.200 .......................................................................................23, 24

Fed. R. Civ. P. 56(a)......................................................................................6, 14

Rule 12(b)(6)........................................................................................................6

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM OF LAW**

Pursuant to Rule 56(a) of the Federal Rules of Civile Procedure and Local Rule 7, Defendants ABC Pediatric Clinic, P.A. ("ABC"), Silen Pahlavan, Sogol Pahlavan, and Mohammad Parvizian (collectively, "Defendants") file this Motion for Summary Judgment and Supporting Memorandum of Law.

## I.      NATURE AND STAGE OF PROCEEDING

On October 13, 2021, Jessica Stark ("Plaintiff" or "Stark") filed an original state court petition asserting the following claims: (1) retaliation in violation of the Texas Medicare Fraud Prevention Act ("TMFPA"), (2) unpaid overtime in violation of the Fair Labor Standards Act ("FLSA"), (3) inaccurate recordkeeping under the FLSA, (4) breach of contract based on the alleged non-payment of earned Paid Time Off ("PTO") benefits upon her separation, and (5) breach of contract arising from an alleged oral multi-year contract to provide babysitting services [Doc. 1-1 at ¶¶ 77 – 107].

On November 21, 2021, Defendants timely removed Stark's suit to federal court pursuant to 28 U.S.C. §1331 (federal question) [Doc. 1].  On November 28, 2021, Defendants answered, and ABC filed counterclaims for violations of the Computer Fraud and Abuse Act (18 U.S.C. §1030(a)(4) and (5) and the Texas Harmful Access By Computer Act (Section 143.001 of the Texas Civil Practices and Remedies Code) [Docs. 4 and 9].   In response, Stark filed motions to dismiss[1] which were denied by the Court on June 2, 2022 [Doc. 26].  The parties have completed discovery and Stark's claims are ripe for summary judgment adjudication.

---

[1] In response to ABC's Original Counterclaims filed on November 28, 2021 [Doc. 4], Stark filed a Rule 12(b)(6) Motion to Dismiss on December 16, 2021 [Doc. 7].  On January 6, 2022, ABC Pediatric filed an Amended Counterclaim [Doc. 9] to which Stark moved to dismiss on January 10, 2022.

## II.    SUMMARY OF THE ARGUMENTS

Contrary to Stark's allegations, ABC, a family-owned pediatric clinic, terminated Stark's employment after she engaged in disruptive and threating behavior during May 2019.  Stark, who was unhappy with ABC's decision not to continue her employment once she started law school during the fall of 2019, reportedly threatened to burn Jennifer Starnes' house down, with her children inside, reportedly turned the triage nurse's phone ringer off precluding her from receiving urgent or emergency patient calls, and defiantly yelled at Mo Parvizian, her supervisor, in front of other ABC employees when he attempted to discuss the foregoing matters with her.   Now, in a desperate attempt to rewrite the narrative, Stark claims ABC fired her for allegedly raising concerns about ABC's Medicaid billing claims practices in violation of the TMFPA, failed to pay her overtime compensation in violation of the FLSA, breached a non-existent contract to pay Paid-Time Off ("PTO") benefits upon her termination, and that the individual defendants breached non-existent contracts to pay her $45 per hour for babysitting services.  Stark fails to raise a genuine and material fact issue on all of her claims.

Stark's TMFPA retaliation claim fails as a matter of law because she did not engage in a protected activity and, in any event, ABC was not aware of such protected activity given the nature of her job duties which required her to investigate ABC's Medicaid reimbursement claims.  Even if Stark is able to establish a genuine and material fact issue on any *prima facie* element of her retaliation claim, she wholly fails to establish that she was terminated *but for* her alleged TMFPA protected activity.

Stark's breach of contract claims fail as matter of law.  There simply was no contract or agreement, based on ABC's PTO policy or otherwise, obligating ABC to pay Stark accrued but unused PTO upon her separation.   Stark's breach of contract claim against the individual

defendants for her alleged babysitting services fails because there was no meeting of the minds sufficient to form a contract to pay Stark $45 -$50 per hour and, even if there is a genuine and material fact issue regarding the existence of such contract, it is barred by the statute of frauds.

Finally, Stark's meritless FLSA overtime is barred by the two-year statute of limitations, and she fails to overcome the untimeliness of her claim by demonstrating, with evidence, a willful FLSA violation.   Even if such claim was timely, the undisputed evidence demonstrates Stark was exempt from the FLSA's overtime requirements under either the administrative, executive or combination exemptions.   Stark's FLSA recording keeping claim is not legally recognized and, consequently, must be dismissed.

## III.   STATEMENT OF RELEVANT UNDISPUTED FACTS

### A.   Introduction.

ABC is a family owned and operated pediatric clinic located in Houston.  Ex. 1, Parvizian Declaration, ¶ 3.  *Id.*  Individual defendants Dr. Sogol Pahlavan and Dr. Silen Pahlavan, own ABC and serve as two of its medical providers.  *Id*.  Individual defendant Mohammad "Mo" Parvizian is the husband of Dr. Silen Pahlavan and manages the business operations of the clinic.  *Id.* At all relevant times, Stark reported to Mo Parvizian.  *Id.*  Jennifer Starnes is an ABC employee who reported Stark's behavior that resulted in her termination and worked in the billing department managed by Stark.  Ex. 2, Stark Dep. 67:16 – 19.[2]  Cynthia Vasquez is another ABC employee who reported behavior but Stark that led to her termination.[3]

### B.   Stark's Employment with ABC

Stark began her employment with ABC in May 2015 as a medical scribe.  Ex. 1, Parvizian Dec. at ¶ 4.  In January 2016, Stark began working as a clerk in the billing department.  *Id.*  In May

---

[2] *See infra* at pp. 8-9.
[3] *See infra* at pp. 8-9.

2016, Stark was promoted to the FLSA over-time exempt role of Billing Manager earning an annual salary of $60,000.[4]  *Id.*

As the Billing Manager, Stark was responsible for supervising and overseeing the billing department and its employees, including Jennifer Starnes, and the medical scribes, and made recommendations regarding any discipline, hiring and termination of such employees.  Ex. 1, Parvizian Dec. at ¶ 4.   Stark was also responsible for investigating ABC's claims for reimbursement submitted to Medicare and private insurance carriers, determining whether any claims were underpaid or over paid and communicating recommendations regarding how to resolve any apparent billing errors or rejected Medicare claims.  *Id*; Ex. 2, Stark Depo. at 63:4—70:25; 75:5—76:25.

Notably, Stark, in her public LinkedIn profile, consistently described her position at ABC as one of management or oversight of ABC's billing department.  She labeled her position as "Director of Operations" and described her duties as follows:

> Provided leadership for key areas including overall practice management, human resources, and billing supervision. Spearheaded efforts to increase profit margins by successfully managing three separate departments. Oversaw human resources tasks using strong communication and analytical skill. Quickly completed tasked using best judgment to triage pressing issues.

Ex. 3, Stark's LinkedIn Profile; Stark Depo. at 63:4—70:25. At her deposition, Stark admitted, in connection with the above-referenced description of her duties at ABC set forth in her LinkedIn profile, that she would have substituted the term "oversaw" for "managing" in connection with the "three departments" referenced that her LinkedIn profile describing her duties at ABC was otherwise accurate. Ex. 2, Stark Depo. at 64:14—65:8. Otherwise, her public profile was accurate. *Id.*

---

[4] Stark's annual compensation in her previous role was $25,000.00.  Ex. 1, Parvizian Dec. at ¶ 4.

Also notable is that during the time Stark worked for ABC and, allegedly, worked so much overtime, she worked at several other companies as an employee or intern, according to her LinkedIn Profile.  Ex. 1, Parvizian Dec. at ¶ 6; Ex. 3, Stark's LinkedIn Profile.  For example, between May 2016 and May 2019, the time she allegedly worked so much overtime of ABC, she worked for: (1) Dasher Law Offices: (2) the University of Houston (where she worked as a Research Assistant & Grant Writer); and (3) Baylor College of Medicine (where she worked as a Research Assistant).  Ex. 3, Stark's LinkedIn Profile.

### C.    Stark Decides to Attend Law School.

Stark recalls deciding to attend law school during "early 2018."  Ex. 2, Stark Depo. at 278:9 – 15.  She planned to attend law school during the fall of 2019; Ex. 1, Parvizian Declaration at ¶ 6; Ex. 2, Stark Depo. at 279:16-20, 288:8-19.  Beginning in "December 2018 or January [or] February 2019," Stark applied to at least 7 law schools.  Ex. 2, Stark Depo. at 281:8 – 282:4.  Stark claims she told Mo Parvizian about her law school plans "around the same time" she made her decision.  Ex. 2, Stark Depo. at 278:16 – 22.  Parvizian recalls Stark telling him during the fall of 2018.  Ex. 1, Parvizian Dec. at ¶ 14.

While employed with ABC, Stark studied for the Law School Admittance Test ("LSAT") during "the summer of 2018" by participating in a "Kaplan" course.  Ex. 2, Stark Depo. at 278:16 – 24.  Stark sat for the LSAT three times, on November 2018, January 2019 and March 30, 2019.  Ex. 2, Stark Depo. at 279:16 - 20.   She studied for the LSAT "two or three" hours each day for "five weeks" or more before each exam.  Ex. 2 Stark Depo. at 279:16—280:4-8.  Defendants accommodated Stark's study schedule so that she would have the entire afternoon each day to study and attend law school interviews.  Ex. 1, Parvizian Dec. at ¶ 6.   Parvizian also wrote and submitted recommendations on behalf of Stark to law schools to which she applied.  Ex. 2, Stark

Depo. at 282:5 – 10; Ex. 4, Recommendation Letter; Ex. 5, Recommendation Letter.[5]  Stark never complained about her schedule; rather, she often thanked the ABC team for accommodating her as she worked towards her goal of becoming a lawyer.  Ex. 1, Parvizian Dec. at ¶ 6.  Stark never complained to ABC about any amounts of overtime she allegedly worked.  *Id* at ¶ 5.  And, she never advised Mo Parvizian that she actually worked more than 40 hours in any work week.  *Id*.

### D.    Plaintiff Temporarily Resides with the Individual Defendants.

From approximately November 2017 through February 2018, while still employed by ABC, Stark lived with Parvizian and his wife Silen Pahlavan.  Ex. 1, Parvizian Dec. at ¶¶ 7-8; Ex. 6, Silen Pahlavan Dec. at ¶¶ 6-7; Ex. 2, Stark Depo. at 179:17 – 19.  She lived with them temporarily due to financial difficulties and until she located a new apartment.  *Id.*  Stark did not have to pay rent; she did not promise to pay rent or contribute in other ways.  *Id*. However, Stark occasionally volunteered to drive Parvizian and Silen Pahlavan's children to basketball practice or housesit when the family was away.  *Id.*  Parvizian and Silen Pahlavan employed a full- time nanny to watch the kids before and during the time that Stark lived with them.  Ex. 1, Parvizian Dec. at ¶ 11; Ex. 6, Silen Pahlavan Dec. at ¶ 9.

There was no agreement between Stark, and Silen Pahlavan and Parvizian, orally or in writing, for a stated rate of $45 or $50 per hour or otherwise, to perform babysitting or any other service as a condition of living at their home rent-free.  Ex. 1, Parvizian Dec. at ¶¶ 8-9.  Although there was no agreement to pay Stark for housesitting or babysitting services, Silen paid Stark in cash any time Stark watched the kids or house, or drove her children to basketball practice.  *Id.*; Ex. 6, Silen Pahlavan Dec. at ¶¶ 8-9.  When Silen offered to pay Stark through services such as

---

[5] Notably, as further discussed below, Parvizian submitted law school references on behalf of Stark *after* she alleged raised "concerns" in "September or October of 2018" about some of ABC's Medicaid reimbursement claims.  Ex. 2, Stark Dep. at 282:11 – 283:22.

Venmo and Zelle, Stark requested that the payments be made in cash because her Venmo and Zelle accounts had been hacked.  Ex. 6, Silen Dec. at ¶ 7.

### E.      Plaintiff's Termination.

As previously discussed, Stark decided in 2018, to attend law school during the fall of 2019.  Parvizian told Stark that although he was happy for her (he submitted law school recommendations for Stark), ABC would not be able to employ her once she started law school. Ex. 1, Parvizian Dec. at ¶ 14.  Stark was unhappy with Parvizian's decision.  *Id*.  Stark's unhappiness with Parvizian's decision eventually manifested through her behavior at work.  *Id.* at ¶ 15.  Stark would often take out her frustrations in conversations with her co-workers.

For example, the relationship between Stark and Jennifer Starnes, the other billing department employee, had grown tense, with Stark often vaguely threatening Stark.  Ex. 7, Starnes Depo. at 55:20 – 56:8. Stark consistently belittled Starnes, holding personal information she had gleaned from conversations over Starnes's head in an effort to blackmail her later. *Id.* at 28:10 – 27:10, 31:2 – 14.  The pettiness reached a head when, on May 6, 2019, Starnes reported to Parvizian that Stark threatened her at work in connection with gossip Stark shared regarding Parvizian and Silen Pahlavan.[6]  *Id.* and Attachment C, Jennifer Starnes' Email; Ex. 7, Starnes Depo. at 20:6 –17, 21:20 – 25, 26:19 – 27:10, 27:14 – 21, 31:2 – 6, 35:6 – 12, 63:4 – 20.  Stark often shared personal information about Silen Pahlavan and Mo Parvizian with Jennifer Starnes. *Id.* at 27:14 – 21. On this instance, Stark threatened Starnes, telling her that if she ever told Mo or Silen that it was her spreading the information, she would burn Starnes's house down with Starnes's children inside the house.  *Id.* at 20:6 – 10. Starnes initially did not take this threat seriously, giving Stark the benefit of the doubt that she was being facetious.  *Id.* at 19:20 – 21:19.

---

[6] As a result of living with Defendants, Stark came to know personal information about Dr. Pahlavan and her husband. Stark would share certain information or stories with her co-workers and subordinates, including Jennifer Starnes.

However, after thinking about what Stark had said on her drive home, Starnes had a panic attack and believed Stark for what she had said.  *Id.*  Starnes informed Mo the next day at work. *Id.* at 26:22 – 27:10. On May 20, 2019, Parvizian asked Starnes to submit her concerns in writing.  Ex. 8, Parvizian Depo. at 39:14 – 40:9.   Starnes emailed the following:

| | |
|---|---|
| **Jennifers Starnes** <jennifer.starnes@abcpediatricclinic.com> | Mon, May 20, 2019 at 3:14 PM |
| To: Parvizian Mo <moparv@gmail.com> | |

I was threatened on many occasions by Jessica Stark, mostly they were threats saying I know a lot about you and things that you have done so if you say anything about what I tell you I will bring you down with me.  She would tell me personal things about my employers that were not any of my business, that she knew only from close personal association with them.  On May 6th 2019 a threat was made that made me very worried for mine and my families safety. Jessica threatened to come to my house and burn it down with me and my three young children in it, if I repeated anything she told me.  I was so upset and anxious about this threat that I had a full blown panic attack on my way home and thought I was having a heart attack.  I also the very next day changed all my contact information in regards to my children at my place of work to an old address so that she would not know where I resided.

--
Jennifer Starnes
Business Office Representative
Phone: 713-455-7777 ext 107
Fax:713-453-7337

Ex. 1, Parvizian Dec. at ¶ 15 and Attachment C, Starnes' Email.

Stark had issues with other employees at ABC, too. Crystal Vasquez, another ABC employer, reported to Parvizian on May 20, 2019 that Stark, on multiple occasions, interfered with the triage nurses work duties.  Ex. 1, Parvizian Dec. at ¶ 15 and Attachment B, Crystal Vasquez Statement.  Vasquez explained that Stark frequently asked the triage nurse "not to take calls" while Stark was working.  *Id*.  ABC's triage nurse also reported that Stark turned her phone ringer off on a number of occasions.  *Id*.  The triage nurse's primary duty was to "triage" urgent patient calls received by ABC.  *Id.*  Stark also "yell[ed] and scream[ed]" at Parvizian when he tried to discuss with her the issues raised by Vasquez and Starnes.  Ex. 8, Parvizian Depo. at 43:4 – 44:16.

The threat to Starnes and her children was the final straw. Parvizian, concerned for Starnes and the other ABC employees after the reported threat, assisted Starnes in preparing a police report

against Stark.  Ex. 1, Parvizian Dec. at ¶ 15; Ex. 9, Police report. Starnes believed the report would

be proof of harm should she or her children ever be injured.  Ex. 7, Starnes Depo. at 26:7 – 11. As

a result, Parvizian decided to terminate Stark's employment on May 20, 2019; he told her to leave

work early for the day.  Ex. 1, Parvizian Dec. at ¶ 15 to the decision to terminate Stark on May 20,

2019.  *Id.*  Parvizian communication his decision on May 21, 2019.  *Id.*

> **F.**      **Stark Sabotages and Interferes with ABC's Work.**

Unknown to Parvizian, Stark secretly changed the password to her ABC work desktop

computer, making it impossible for ABC personnel to log in or use the computer.  Ex. 1, Parvizian

Dec. at ¶ 16.    Stark altered the password ABC's knowledge, permission or consent.  *Id*.  Her

unauthorized access and alteration of the ABC desktop computer password caused a delay in

ABC's work on an ongoing audit.  *Id.*  Such delay resulted in ABC having to divert employee

work time to "catch up" on the audit work.  *Id.*  ABC's diversion of employee time interrupted

ABC's timely applications for Medicaid/Medicare reimbursement revenue resulting in a loss of

revenue during such period.  *Id.*    ABC also incurred the expense of engaging a third-party

information technology vendor in connection with investigating and responding to Stark's

unauthorized access of the ABC computer and unauthorized alteration of its log-in credentials.  *Id.*

The cost and expense of the extra work time and third-party vendor exceeded $5,000.  *Id.*

Believing Stark had sabotaged access to the computer on purpose, Parvizian filed a police report

on behalf of ABC.  *Id.*

## IV.   SUMMARY JUDGMENT STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 mandates that a "court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). To avoid summary judgment, the

plaintiff must present evidence—not simply conjecture and speculation. *See Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996). A plaintiff must "set forth specific facts showing there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Assertions of ultimate facts without supporting specifics will not suffice to avoid summary judgment. *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986). Courts should grant summary judgment "not only when the non-movant presents no evidence, but also when there is not a sufficient conflict in substantial evidence to create a jury question." *See Scott v. Univ. of Miss.*, 148 F.3d 493, 504 (5th Cir. 1998) (internal quotes omitted). "A mere scintilla of evidence is insufficient to present a question for the jury." *Id.*

As explained in detail below, no genuine issue of material fact exists with respect to Plaintiff's claims. ABC is, therefore, entitled to summary judgment as a matter of law and the action should be dismissed with prejudice.

## V.      ARGUMENTS AND AUTHORITIES

### A.      Plaintiff's TMFPA Retaliation Claim.

Stark alleges her employment was terminated because she raised concerns regarding three types of alleged billing practices at ABC: Double-billing private insurance and Medicaid, "upcoding" claims to Medicaid for hearing exams and earwax removal, and falsely billing Medicaid for vaccines. [Doc. 1-1 at ¶¶ 77 – 83]. At her deposition, Stark testified she raised these concerns in September or October of 2018. Ex. 2, Stark Depo. at 250:13 – 251:3; 253:25 – 254:3; 282:11 – 283:22. As discussed below, Stark claims fail as a matter of law.

The TMFPA prohibits an employer from retaliating against an employee who engages in the investigation for, initiation of, testimony for, or assistance in a potential action regarding Medicaid fraud prevention. TEX. HUM. RES. CODE § 36.115. To state a *prima facie* case for

retaliation under Section 36.115 of the TMFPA, a plaintiff must state a valid claim of retaliation using the *McDonnell-Douglas* framework. *Diaz v. Kaplan Higher Educ.,* 820 F.3d 172, 175 n.3 (5th Cir. 2016) (finding that TMFPA claims are analyzed in the same way as retaliation claims brought under the False Claims Act, using the *McDonnell-Douglas* analysis). Thus, Stark must show that she: (1) engaged in protected activity, (2) ABC knew of the protected activity, and (3) ABC retaliated against her because of her protected activity (or, in other words, that a causal connection exists between Stark's protected activity and her later termination). *U.S. ex rel King v. Solvay Pharms*., 871 F.3d 318, 332 (5th Circ. 2017); *see also United States ex rel. Bias v. Tangipahoa Par. Sch. Bd*., 816 F.3d 315, 323 (5th Cir. 2016).

If Stark raises a genuine and material fact issue regarding all three of the foregoing *prima facie* elements, the burden shifts to ABC to produce a legitimate, nondiscriminatory reason for Stark's termination. *Solvay Pharms.,* 871 F.3d 318 at 332. If ABC produces said reason, the burden of proof shifts back to Stark to show that ABC's reasoning for termination (or other adverse employment action) is pretextual, meaning the termination would not have occurred but for a retaliatory motive. *Garcia v. Prof'l Contract Services, Inc.,* 938 F.3d 236, 244 (5th Cir. 2019). Stark does not meet any of the elements of her *prima facie* case and, in any event, she cannot show her termination would not have occurred "but for" a retaliatory motive.

## 1.    Stark did not engage in protected activity known to ABC.

Stark's retaliation claim fails before it can get off the ground. Stark produces no evidence that she engaged in protected activity or that ABC was aware of any complaints she made—the first two elements of proving her *prima facie* case. Stark never made any reports of improper billing to Parvizian or any other ABC personnel. Ex. 9, Parvizian Depo. at 44:21-45:19, 46:7-48:14, 96:5-8, 105:6-14, 131:9-17, 132:5-8. Any allegation that she did so is false. At best, Stark

may have asked questions about the billing codes used by ABC to claim Medicaid reimbursements, but she never communicated accusations of fraudulent, or "illegal" activity by ABC, or communicated that she planned to file suit against ABC because of the alleged "fraud" or "illegal" activity.  In similar cases involving employees whose duties including investigating claims, courts have dismissed False Claims Act ("FCA") whistleblower retaliation claims because the employee failed to use the terms "fraud" or "illegal" to report activity prohibited by the FCA or otherwise put the employer on notice of the protected activity.  *See Vaughn v. Harris Cty. Hosp. Dist.,* No. 4:17-CV-2749, 2021 U.S. Dist. LEXIS 188576 (S.D. Tex. 2021); *see also Robertson v. Bell Helicopter Textron,* 32 F.3d 948 (5th Cir. 1994); *see also United States ex rel. Smith v. Yale Univ.,* 415 F. Supp. 2d 58 (D. Conn. 2006).

In *Vaughn,* the court held that in order for an internal complaint to be considered protected activity for the purposes of a retaliation claim, the complaints could not merely relate to concerns of general misconduct or criticism, but instead needed to be characterized as an exposé of illegality. *Vaughn,* No. 4:17-CV-2749, at *12.  The *Vaughn* court specified that an employee who mentioned the FCA in a letter to his employer engaged in protected activity, but only because his employer specifically knew that it was being reported to the government for fraud. *Id.* at *12-13. Stark's alleged complaint and deposition testimony, even if true, does not rise to this level of specificity— she raised nothing more than internal questions about ABC's billing code procedures.

Similarly, in *Robertson,* the court found that the plaintiff employee who voiced his concerns regarding the overcharging of a government contractor on a helicopter refitting project did not engage in protected activity given that the employee "never characterized his concerns as involving illegal, unlawful, or false-claims investigations." *Robertson,* 32 F.3d 948 at 952.

Likewise, in *Smith,* the court followed Second Circuit precedent in finding that a plaintiff failed to complain of a violation of the FCA because he failed to identify "a specific amount of charges that were submitted" and could not provide specifics indicating any level of reliability of the report, including the dates the false claims were submitted or copies of the false payments. *Smith,* 415 F. Supp. 2d 58 at 73.

As further evidence that ABC was unaware Stark made any complaints of fraudulent billing practices, Stark cannot show that Parvizian or any other ABC managers knew she had made a complaint of said fraudulent activity.  Parvizian testified that Stark never complained to him about illegal billing practices: She never expressed concerns about "double-billing;" she never asserted that ABC was using a code to bill a procedure it did not have the equipment for; and she never discussed improper billing for vaccines.  *Id.*  In fact, Parvizian testified that he and Stark generally did not disagree about billing procedures ever.  *Id.* at 44:21-45:19.  Parvizian is the only manager at ABC who would have had any knowledge about billing; Stark's failure to alert Parvizian to any fraudulent activity negates her claim for retaliation as a result of engaging in any protected activity. Ex. 6, Silen Depo. at 153:21-23 (explaining that doctors do not choose specific codes for billing— that is the job of the billing department).

In view of the foregoing, Stark's alleged complaints of improper billing, even if assumed true, do not rise to the level of engaging in TMFPA protected activity.  Stark mischaracterizes her job duties, forgetting that it was Stark's job as a Billing Manager to investigate flaws in ABC's billing procedures.  Her alleged discussions of the Medicaid reimbursement coding issues, even assuming such discussions occurred, do not constitute TMFPA protected activity or put ABC on alert of a report of such protected activity.  Stark's "complaints," do not, as a matter of law, rise to

13

the level of protected activity known by ABC.   Consequently, ABC is entitled to summary
judgment on Stark's TMFPA claim.

### 2. Stark's termination was for legitimate, nondiscriminatory reasons and was not the "but for" result of her protected activity.

Even assuming Stark could show she engaged in protected activity known to ABC, she
cannot show that her termination was the "but for" result of her engaging in said, as is required to
prove her *prima facie* case.  Plain and simple, Stark's termination was the result of her reported
behavior towards other ABC employees, not a pretext for any alleged retaliatory motive by ABC.
Given Stark's familiarity with the owners of ABC and her ability to see the addresses of other
employees in the clinic's internal system, the threat of injuring a fellow employee's children gave
great pause for concern that Stark was more than capable of acting out said threat.  *Lister v. Nat'l
Oilwell Varco, L.P.,* No. H-11-0108, 2013 U.S. Dist. LEXIS 142254, at *56-57 (S.D. Tex. 2013)
(holding that an employer who terminated an employee for making a threat in the workplace had
a legitimate, nondiscriminatory reason for taking such action).  Further, at that point, it became
clear that Starnes and Stark would not be able to work side-by-side in the billing department due
to Starnes's fear that Stark's threat may be carried out.  Ex. 7, Starnes Depo. at 21:20-25 (wherein
Starnes testifies that Stark threatened her on multiple locations and told Starnes she would "go
down with [her]").  Stark cannot point to any other evidence that ABC's reasoning for her
termination is pretext for retaliation for engaging in protected activity, let alone that she engaged
in protected activity in the first place.  Thus, her TMFPA retaliation claim fails for this additional
reason.

### 3.   No other adverse employment action occurred in connection with Stark's alleged "complaint."

Besides her termination, Stark also alleges several other "adverse actions" that she believes resulted from her alleged complaints about fraudulent billing practices.  Yet Stark produces no evidence that any such actions: 1) occurred or, 2) occurred in retaliation of an earlier complaint. Stark claims received a reduction in pay, that ABC told Loyola Law School that she would not be attending, that ABC submitted a false report accusing her of a cybercrime, and that ABC told Jennifer Starnes to make a false accusation to the police about Stark's threat.  These claims are unfounded and unsupported by any evidence.

Stark produces no evidence that she received a reduction in pay.  Rather, Stark received a pay increase in 2016 while employed at ABC.  Ex. 10, Pay Increase Form.  Nor does she produce any evidence that anyone at ABC jeopardized her enrollment at Loyola Law.  She requested that Parvizian write a letter of recommendation to Loyola Law, which he did, *after* she alleged reported her concerns.  Ex. 11, Loyola Letter.  Likewise, Stark produces no evidence that ABC's police report following her failure to produce a valid password for her work computer was falsely made or that ABC forced Starnes to make a false accusation about the threat.  ABC has produced evidence of Stark's duplicity with her computer password following her termination.  Ex. 12, Cybercrime Emails and Report.  Further, Starnes testified under oath that she reported Stark threat to Parvizian and also submitted a police report of her own volition.  Ex. 7, Starnes Depo. at 20:6-10, 26:2-3.  Stark produces no contradicting facts that these actions occurred.  Stark cannot prove she suffered any adverse employment action besides her termination, which was justified for the reasons previously discussed.  For these reasons, ABC is entitled to summary judgment on Stark's TMFPA claim.

**B.      Plaintiff's FLSA claims.**

Plaintiff alleges that Defendants violated two tenants of the FLSA: that ABC failed to pay Stark overtime and failed to maintain accurate records of overtime worked.  Yet Stark produces no evidence that her role entitled her to overtime pay.  Nor does she produce any evidence that ABC had a duty to maintain certain records for her or that ABC failed to maintain those records. Her FLSA claims fail.

**1.      Stark's overtime claim**

Stark's claim that ABC failed to pay her overtime since May 2016 has no merit.  Stark brings no evidence to dispute that she was an exempt employee and therefore not entitled to overtime payments.  Nor can Stark show that she legitimately worked more than forty hours in any given week.  Thus, her claim fails.  Regardless, Stark's FLSA overtime claims are outside of the two-year statute of limitations for claims of this type, so her claim is barred.

**a.      Stark's overtime claim is barred by the two-year statute of limitations.**

A two-year statute of limitations exists for overtime claims brought under the Fair Labor Standards Act ("FLSA").  The only time a plaintiff may escape this limitation is if she can show her employer willfully misclassified her as an exempt employee not eligible for overtime, knew or should have known about the overtime that employee worked, and failed to pay her the overtime. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). Negligence alone is not enough to show willfulness.  *Steele v. Leasing Enters., Ltd.,* 826 F.3d 237, 248 (5th Cir. 2016); *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 926 (5th Cir. 2018), *as amended on denial of reh'g and reh'g en banc* (Feb. 1, 2019).  An employee must show the employer acted with actual knowledge or recklessness.  *Ramos v. Al-Bataineh*, 599 F. App'x 548, 551 (5th Cir. 2015).  If an employee is able to show this, the statute of limitations extends to three years.  *Id.*

Here, Stark does not escape the two-year statute of limitations for her FLSA overtime claim.  Stark alleges she was not paid overtime starting in May 2016 through her termination in May 2019.  *See* Petition.  She brought suit alleging failure to pay overtime in 2021, nearly five years after she alleges the clock started running on her overtime claim.  *Id.*  This timeline far surpasses the two-year statute of limitation for her claim.  Nor can Stark show that she was willfully misclassified.  She produces no evidence that Defendants purposefully misclassified her in an attempt to get around the limitations of the FLSA.  Even if Stark could show ABC willfully misclassified her, which she cannot, even that claim would be outside the extended three-year statute of limitations.  Stark presents no evidence that ABC willfully misclassified her as an exempt employee, willfully nor not.  Thus, her claims are barred.

> **b.**  **As an exempt employee, Stark was not eligible for overtime payments, nor did she ever work more than forty hours such that overtime hours were earned.**

Nor does Stark present any evidence that she was not an exempt employee while working in the billing department for ABC.  Under the FLSA, an employer must pay overtime to non-exempt employees who work more than forty hours per week.  29 U.S.C.S. Sec. 207(a)(1).  For Stark to demonstrate that she is entitled to overtime payments, she would have to show that she is non-exempt.  *Id.*  There are several categories of "exempt" employees.  Stark fits into the category of "administrative" employees, who are exempt from the FLSA and therefore are not paid overtime for any hours worked in excess of forty.  Thus, Stark's claim for overtime fails.

Under the "administrative employee" exception, an employee who is paid a salary of no less than $684 per week, whose primary duty involves the performance of office work directly related to management or the general business operations of the employer or employer's customers, and whose primary duty also includes the exercise of direction and independent

17

judgment with respect to matters of significance, is exempt from the FMLA. *See* 29 CFR §. 541.200.  Work related to the management of a business is that of "substantial importance" to the business operations of the enterprise including duties such as "advising the management, planning, negotiating," etc. *See Hobbs v. EVO Inc.,* 394 F. Supp. 3d 717, 742 (S.D. Tex. 2019), *citing Dalheim v. KDFW-TV,* 918 F.2d 1220, 1230 (5th Cir. 1990) (defining "directly related" work).  It can include "accounting; budgeting; auditing. . . legal and regulatory compliance. . ." 29 C.F.R. Sec. 541.201(b).  To determine when an employee's duty involves the exercise of discretion and independent judgment, courts look to whether the employee makes decisions or recommendations, even if such decisions are reviewed or even reversed by senior management). *See Cheatham v. Allstate Ins. Co.,* 465 F.3d 578, 585 (5th Cir. 2006).  Stark's role as a billing manager at ABC fits perfectly into this description.

Stark acted as the manager of the billing department, working alongside one other billing employee, Jennifer Starnes. Ex. 2, Stark Depo. at 64:14-65:4, 67:9-21.  She was paid more than $684 per week.  Ex. 10, Pay Increase Form; Ex. 8, Parvizian Depo. at 12:11-14, 15:1-13, 17:1-4 (describing how Stark became manager of billing department so her salary changed from $25,000 to $60,000 per year).  Her primary duty included the performance of non-manual, office work directly related to the business operations of customers, being that her main duty included billing customers and insurance companies for services performed by pediatricians at the clinic.  Ex. 1, Parvizian Dec. at ¶ 4. Lastly, her duties involved the exercise of direction and independent judgment.  Ex. 2, Stark Depo. at 67:9-21; Ex. 8, Mo Depo at 134:8-14.  Whenever her subordinate, Jennifer Starnes, had a question about which code to bill, she would ask Stark and would follow Stark's instructions.  Stark made decisions about which codes would be used to bill certain insurance companies, clients, and government programs, asking Mo for advice when she had

questions.  *See* 29 C.F.R. §. 541.202(b) (listing activities that could constitute the exercise of discretion, including the employee's authority to commit the employer in matters with significant financial impact, the authority to negotiate and bind the company, and whether the employee affects business operations).  Above all, Stark admits to believing she was a salaried employee ineligible for earning overtime.  Ex. 2, Stark Depo. Vol. 2 at 22:6-15, Stark Depo. Vol. 1 at 150:15-21.  Without a doubt, Stark's role as billing manager accurately fits into the "administrative employee" exception; thus, she was classified as such during her time at ABC and received a salary.  Stark now feigns ignorance regarding her classification as an exempt employee, despite her acute knowledge regarding her role and inability to claim overtime while at ABC.

Even if she were a non-exempt employee, Stark would not be owed overtime.  Stark rarely worked more than forty hours per week, given she mostly worked part-time due to working other jobs, studying for the LSAT, or applying for law school.  Ex. 2, Stark 2nd Depo at 86:3 – 8 (admitting she "worked" for ABC and did other tasks at same time, including babysitting), 88:2 – 3 (citing her normal office hours as 7 am to 3 pm).  Her various other positions held concurrently with her employment with ABC and her need to work in the office rather than remotely, as she insists, negates her ability to work more than forty hours per week with ABC.  Ex. 13, Stark resume.  Stark's overtime claims fail.

### 2. Stark's inaccurate recordkeeping claim fails because Section 211(c) does not create a private right of action.

Stark further alleges ABC violates two recordkeeping provisions under the FLSA: 29 U.S.C. Sec. 211(c) and 29 C.F.R. pt. 516.  These statutes pertain to the collection of data and records to be kept by employers.  "The FLSA, however, contains no private enforcement mechanism if the employer fails to maintain such records." *Aviles v. Kunkle,* 765 F.Supp. 358, 369 n. 12 (S.D. Tex. 1991), *vacated on other grounds,* 978 F.2d 201 (5th Cir. 1992).  Thus, Stark has

no basis on which to bring a claim for improper recordkeeping under the FLSA against ABC. Because she has no basis for her claim, her claim automatically fails.

### C.     Plaintiff's breach of contract claims.

Plaintiff asserts Defendants breached two alleged contracts: (1) an alleged agreement to pay unused but earned paid time off ("PTO") upon her separation; and (2) an oral contract for babysitting services.   As discussed below, neither contract exists: ABC's PTO policy did not contractually obligate ABC to pay her for any unused PTO at end of her employment, and any alleged oral contract Stark claims she entered into for babysitting services extended further than one year and is therefore illegitimate under the State of Frauds doctrine.

Plaintiff's breach of contract claims require: (1) the existence of a valid contract; (2) performance or tendered performance by plaintiff; (3) breach by the defendant; and (4) damages. *Mullins v. TestAmerica, Inc.,* 564 F.3d 386, 418 (5th Cir. 2009).  In Texas, to form a valid contract, the following conditions must be present: (1) offer; (2) acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; (5) execution and delivery with intent to be mutual and binding; and (6) consideration. *Pennington v. HSBC Bank* USA, N.A., 493 F. App'x 548, 552 (5th Cir. 2012).  Stark's breach of contract claims fail before they begin: She cannot show the first element of her claims—the existence of a valid contract for unpaid PTO or for babysitting.

#### 1.      Breach of Employment Contract Claim based on alleged unpaid PTO

No genuine dispute of material fact exists regarding PTO benefits owed to Stark upon her termination.  Stark cannot show the existence of a contract that says she is entitled to unused PTO in the form of a payout at the end of her employment.  In Texas, "vacation pay . . . [is] payable to an employee upon separation from employment only if a written agreement with the employer or a written policy of the employer specifically provides for payment." *See, e.g., Tavakkoli v. Helwig*,

No. 3:16-CV-2202-N, 2017 WL 10126204, at *3 (N.D. Tex. June 20, 2017).  To constitute a valid

contract for unpaid PTO, the employment contract must specifically address paid time off policy.

*Bush v. Kadirnet, LLC,* No. 1:18-CV-1024-RP, 2020 U.S. Dist. LEXIS 27820 (W.D. Tex. 2020),

*citing Mullins v. TestAmerica, Inc*., 564 F.3d 386, 418 (5th Cir. 2009).  ABC's PTO policy does

not contractually obligate ABC to pay Stark for unused PTO upon her separation.  *See* Ex. 18,

Employment Policies.  Stark even admits that ABC did not have a written policy providing for the

payout of unused PTO benefits upon termination, and that no one else at ABC promised to pay her

out her unused accrued PTO benefits.  *See* Ex. 2, Stark Depo. at 290:13-291:16. Stark's failure to

present evidence of a contract allowing her paid out PTO leaves her unable to prove the first and

crucial element of her breach of contract claim.  Thus, her claim fails.

### 2.      Plaintiff's Breach of Contract Claim for Babysitting

Similarly, Stark does not point to evidence sufficient to create a genuine dispute of material

fact that ABC breached any alleged babysitting contract she formed with Defendants.  Again, Stark

cannot show that a valid contract was formed, given the lack of a meeting of the minds and consent

to terms.  Further, even if an oral contract was formed as Stark alleges, the contract violates the

statute of frauds in that it should have been reduced to writing and is therefore unenforceable.

### a.      No meeting of the minds occurred such that a valid contract for babysitting services was formed.

In order to show the existence of a valid babysitting contract, Stark must show the parties

entering into the contract had a "meeting of the minds" and mutually consented to the terms.  *See*

*Pennington,* 493 F. App'x 548 at 552.  She cannot show either of these elements.  A "meeting of

the minds" exists when the parties agree to the subject matter and essential terms of the contract.

*Stewart & Stevenson, LLC v. Galveston Party Boats, Inc.,* Nos. 01-09-00030-CV, 01-09-00111-

CV, 2009 Tex. App. LEXIS 8582, at *21 (Tex. App.—Houston [1st Dist.] Nov. 5, 2009, no pet.).

Mutual consent can be determined based on the objective standard of what the parties said and did. *Id.*

Stark does not present any evidence that any of the Defendants knew of or consented to the existence of a contract (or even a formalized agreement). Ex. 8, Parvizian Depo. at 119:28 – 121:6. Objectively, based on the actions of the parties supposedly entering into the contract, the real story shows the following: Parvizian and Silen Pahlavan occasionally asked Stark to look after their house or children while she was living in their house and would pay her in cash on occasion as an act of generosity for helping them out. Stark's relationship with the family on a personal level made it easy for Parvizian and Silen Pahlavan to trust Stark to occasionally play with or watch the children. No further meeting of the minds or mutual consent existed as to the formation of a contract for babysitting. Defendants were fully unaware that Stark considered their relationship to be contractual. In fact, Defendants employed a nanny during the timeframe that Stark alleges she babysat. Ex. 15, Nanny Log. It was the nanny's role to actually watch the kids and be paid contractually for doing so; Stark's role was not remotely similar. Ex. 16, Silen Depo at 121:2 – 13. The nanny was paid full-time to watch the kids and would not have watched the kids at the same time as Stark. *Id.* It was only on the off-chance that either of the parents dashed out to pick up dinner, for example, that Stark would keep an eye on the children. Clearly, no meeting of the minds existed as to the formation of a babysitting contract.

Not only does Stark fail to show the need for or existence of a babysitting contract, but she cannot produce evidence of agreed-upon terms of the contract. There is no evidence that Parvizian, Silen Pahlavan, or Sogol Pahlavan ever were ever in agreement with Stark as to several essential terms of the alleged contract: the timing of Stark's babysitting; whether she would be paid; how much she would be paid; and what the extent of her duties were, among other factors. There were

no set rules or rates, especially given the fact that Parvizian and Silen Pahlavan were not charging Stark any rent at the time.

Stark alleges that Defendants "knew" she had a specific hourly rate of $45-50 per hour for babysitting based on her "Care.com" page. Ex. 2, Stark Depo. at 79:16 – 20, 182:15 – 184:15. She argues that because this page existed and she at one point allegedly mentioned it to Defendants, that Defendants agreed to pay this rate. *Id.* However, Stark presents no evidence that Defendants actually knew of and consented to pay her this rate. She admits as such. Ex. 2, Stark Depo. at 176:20 – 24 (admitting she did not log her babysitting hours for Defendants on her care.com site because they did not use her through care.com, but rather used her "privately"). And because Stark cannot produce evidence of an existing, valid contract with mutuality, consent, or a meeting of the minds, her breach of contract claim fails.

> **b.    Even if a valid contract for babysitting was formed, the oral contract involved services lasting more than one year and violates the statute of frauds.**

Even assuming a valid contract for babysitting services was formed between Stark and Defendants, due to the oral nature of the contract, the contract would violate the statute of frauds and, thus, be invalid. "An agreement which is not to be performed within one year from the making of the agreement is not enforceable unless it is in writing and signed by the person to be charged with the agreement." TEX. BUS. & COMM. CODE ANN. Sec. 26.01(a), (b)(6).

Stark admits that any alleged "contract" for babysitting was not written down or reduced to writing in any way. Ex. 2, Stark Depo. at 62:4 – 5, 186:2 – 4. Further, the "contract" extended for more than one year. Stark alleges she began babysitting on April 12, 2018 and continued until April 13, 2019. *See* [Doc. 1-1]; *see also* Ex. 17, Babysitting Log. Stark has not and cannot produce any evidence showing a written, signed instrument exists evidencing a contract between herself

and Defendants regarding babysitting.  Because, at best, only an oral contract exists, and because the alleged "contract" was not performed within one year, the agreement is outside the statute of frauds and is therefore invalid.  Stark's breach of contract claim in regards to any alleged babysitting contract fails.

## VI.    CONCLUSION AND PRAYER

For all the foregoing reasons, Defendants ask the Court to grant summary judgment and render a final judgment in this case dismissing all of Plaintiff's claims with prejudice and awarding Defendants their costs.  Defendants further request all other relief, in law or equity, to which Defendants may be entitled.

Respectfully submitted,

/s/ *Charles H. Wilson*
Charles H. Wilson (Attorney-in-Charge)
Federal I.D. No. 34581
Texas Bar No. 797678
Charles.Wilson@jacksonlewis.com
Haley E. Kurisky
Federal I.D. No. 3709694
Texas Bar No. 24125798
Haley.Kurisky@jacksonlewis.com

**JACKSON LEWIS P.C.**
717 Texas Avenue. Suite 1700
Houston, TX 77002
Telephone:     (713) 650-0404
Facsimile:     (713) 650-0405

**ATTORNEYS FOR DEFENDANTS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I filed the foregoing document on January 5, 2023, with the Clerk of the Court of the United States District Court for the Southern District of Texas using the CM/ECF system pursuant to the Court's electronic filing requirements, which constitutes service of the filed documents on all counsel of record as listed below:

Cory Fein
S.D. Texas Bar No.:
Cory Fein Law Firm
712 Main Street, Ste. 800
Houston, Texas 77002
Telephone:    (713) 730-5001
Email: cory@coryfeinlaw.com

*Attorney for Plaintiff*

*/s/ Charles H. Wilson*
Charles H. Wilson

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JESSICA STARK, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:21-cv-03822 |
| | § | |
| ABC PEDIATRIC CLINIC, P.A., et al. | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANT'S APPENDIX OF EXHIBITS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

| EX NO. | DESCRIPTION |
|:---:|---|
| 1 | Declaration of Mohammad Parvizian |
| 2 | Deposition Excerpts - Jessica Stark Vol. 1, Vol. 2 |
| 3 | Jessica Stark LinkedIn Profile |
| 4 | Parvizian's Letter of Recommendation 10.23.18 ABC 61 |
| 5 | Parvizian's Letter of Recommendation 10.23.18 ABC 62 |
| 6 | Declaration of Silen Pahlavan |
| 7 | Deposition Excerpts - Jennifer Starnes |
| 8 | Deposition Excerpts - Mohammad Parvizian |
| 9 | Starnes' Police Report |
| 10 | Salary Increase ABC 70 |
| 11 | Loyola Letter – Acknowledging Parvizian's letter of recommendation |
| 12 | Cybercrime emails and report ABC 123-124, 126-129 |
| 13 | Stark Resume ABC 132-133 |
| 14 | Stark's paycheck history reports ABC 286-287, 289 |
| 15 | Nanny log sheet ABC 413 |
| 16 | Deposition Excerpts - Silen Pahlavan - Vol. 2 |
| 17 | P's Depo Ex. 13 - Babysitting log STARK 1-2 |
| 18 | Employment Policies (unsigned) ABC 40-49 |
| 19 | Declaration of Sogol Pahlavan |

4853-9854-9313, v. 5

26